SALTER, J.
Coral Reef Drive Land Development, LLC, appeals a summary judgment and final judgment of foreclosure entered in favor of Duke Realty Limited Partnership.[1] The issue is whether the appellants raised genuine issues of material fact for trial supporting legally sufficient claims that: (a) the lender exercised such control as to transform the debtor-creditor relationship into a joint venture, and (b) certain alleged verbal communications between representatives of Coral Reef and Duke Realty, considered in light of the sophisticated written agreements governing the parties’ multi-million dollar development plans, constituted a binding commitment by Duke Realty to enter into a joint venture with Coral Reef. We concur with the trial court’s assessment and affirm.
Our review of the interpretation and application of the contract provisions is de novo, and we consider the record by resolving “all doubts and inferences in favor of the non-moving party.” Sheikh v. Coregis Ins. Co., 943 So.2d 242, 244 (Fla. 3d DCA 2006).

The Loamr^mth-Option

The detailed documents entered into by the parties have more bells and whistles than the once-conventional commercial promissory note and mortgage. The terms of the documents afforded Coral Reef a first mortgage loan of $10,000,000 for the purchase and initial development of some 12 acres of prime commercial property in southwest Miami-Dade County. The property adjoined Jackson South Community Hospital and was to be developed and leased as medical offices. Duke Realty, an Indiana-based commercial real estate development partnership, bargained for an option that essentially would allow it to acquire the property by paying Coral Reef a premium of $1,500,000 above the amounts necessary to repay the Duke Realty loan and to reimburse Coral Reef for the interest costs and rezoning expenses. In the event Duke Realty exercised the option, Coral Reef would then have the right to require the property to be contrib *900 uted to a joint venture in which Duke Realty would control 75%, and Coral Reef or its principals 25% of the venture.
This was meticulously documented in lengthy single-spaced documents: an 11-page promissory note; a 47-page recorded first mortgage, security agreement, and assignment of leases and rents; a 24-page loan agreement; and a 36-page form of limited liability company operating agreement (to be entered into if the applicable options were exercised in accordance with section 9.17 of the loan agreement). The loan agreement referred to these instruments collectively as the “Loan Documents.” The agreements were reviewed by attorneys for the parties.
The Loan Documents contained common “boilerplate” terms — a merger and integration provision, a waiver of the right to trial by jury, and a stipulation that no oral modification or waiver would be binding unless and until reduced to a written agreement signed by the parties. Importantly, the mortgage also included this provision:
9.18 No Joint Venture. Notwithstanding anything in any of the Loan Documents or in any other agreement or commitment to the contrary, neither the Loan Documents nor the transactions described in the Loan Documents nor the rights and obligations granted therein shall in any way create or contribute to the creation of a partnership or joint venture or similar arrangement between Borrower and Lender.
Regarding Duke Realty’s exercise of its option to acquire the mortgaged property, the loan agreement addressed the timing and method of exercise in a lengthy option provision that included this language:
The Option shall be in effect from the date hereof until the date which is two (2) years after the date hereof and may be exercised by Lender, BD, or any other designee of Lender at any time upon written notice to Borrower (the “Option Notice”).
The loan agreement also specified that any notice required or permitted under its terms “shall” be given in accordance with the notice provisions in the mortgage. Section 9.5 of the mortgage, “Notices,” required that all notices required or permitted to be given “shall be in writing” and also specified how such notices were to be mailed or delivered.

Default, Emails, Development Activity, and Foreclosure

During 2006 and early 2007, representatives of Duke Realty participated actively with Coral Reef and its principals in studying the medical office needs and status of the Hospital, in monitoring the rezoning process, and in evaluating prospective architects and contractors. Coral Reef asserts that these representatives were identifying themselves and doing business as “development partners” of Coral Reef, not as the representatives of a lender. In early 2007, Duke Realty continued to comment on designs, tenant office layouts, and construction cost estimates in anticipation that the rezoning would be approved.
In April 2007, one of the principals of Coral Reef sent an email to a principal of Duke Realty stating that Coral Reef could not pay back interest due under the terms of the mortgage “due to unforeseen circumstances,” and proposing a meeting to discuss restructuring the mortgage. A representative of Duke Realty then emailed a principal of Duke Realty to advise that “the partners” in the “deal south of Miami” “have evidently run into cash flow difficulties, and are not making debt payments.” The final zoning approvals were thought to be forthcoming in about a month.
*901 The rezoning was indeed approved in May 2007. Coral Reef asserts that Duke Realty was “surreptitiously” using its own separate land use attorney to attend the zoning hearing and report to Duke Realty. Shortly after the rezoning, Douglas Land-sea of Coral Reef allegedly had a telephone conversation with Donald Dunbar from Duke Realty in which Landsea allegedly asked for a “firm commitment” that Duke Realty would exercise its purchase option. Failing that, Landsea allegedly said, Coral Reef would refinance or sell the property and pay off the loan. Landsea maintains that Dunbar “unequivocally committed” that Duke Realty would exercise the option. One important consequence of an exercise of the option was that the defaulted interest would not be due at the closing. Corroboration for this confirmation is alleged by Coral Reef to be in an email in which Dunbar told his boss “I believe we will stay in the deal,” and “I can’t imagine not buying this dirt.”[2] Coral Reef alleges that it relied on this commitment by eschewing active efforts to refinance the loan with Duke Realty or to sell the property, but there is no evidence that Coral Reef engaged in or initiated any such activities or that it could have obtained a refinancing or sale in a net amount sufficient to pay off the existing loan.
It is undisputed that in October 2007, Duke Realty sent (and Coral Reef and the guarantors received) a written default notice regarding the loan. That notice was squarely inconsistent with any belief that the purchase option would be exercised by Duke Realty in two months. Coral Reef alleges, however, that representatives of Duke Realty “represented to Coral Reef that [the default notice] was a mere formality required by its loan committee and that, as agreed, Duke would purchase the property by December 14.” Taking this allegation as well as true, this was a second alleged verbal promise to forbear from collection of the defaulted interest. Coral Reef also alleges that Duke Realty misled Coral Reef into setting up meetings with medical office and Hospital representatives as if the joint venture would be moving ahead.
On December 10, 2007, four representatives of Duke Realty prepared an internal “deal summary memorandum” that evaluated Duke Realty’s alternatives (one of which was foreclosure) regarding the defaulted loan. Four days later, Duke Realty filed its foreclosure action.
Coral Reef and the two guarantors responded with affirmative defenses and counterclaims alleging waiver, fraud, unclean hands, breach of joint venture contract, breach of fiduciary duty, promissory estoppel, unjust enrichment, and tortious interference. After pretrial discovery, Duke Realty moved for final summary judgment, which was granted. This appeal followed.

Analysis

A promise that any agreement waiving or modifying loan terms is to be in writing ordinarily is no less entitled to be enforced than a promise to make a payment by a certain date. In Florida,[3] oral *902 modifications are permitted despite such provisions, however, when one party provides additional consideration for the modification accepted by the other party. Davidpur v. Counne, 972 So.2d 891 (Fla. 3d DCA 2007); St. Joe Corp. v. McIver, 875 So.2d 375, 382 (Fla.2004).
In this case, Coral Reef provided no such consideration for the alleged modification of the loan documents. Continued effort to rezone the property, or to find tenants, was part of Coral Reefs original obligation, not an additional consideration. The alleged “agreement” not to refinance or sell does not represent additional consideration, as (a) there is no evidence whatsoever that Coral Reef ever attempted to refinance or sell the property, much less that it could have done so,[4] and (b) any notion that Duke Realty had “firmly committed” to exercise the purchase option in December could hardly have been relied upon after the undisputed receipt of a written default notice two months before the date the option was to expire.
Turning next to Coral Reefs affirmative defenses and counterclaims based on estoppel and fraud, the critical legal shortcoming is the element of justifiable reliance. In this case, Coral Reef and the guarantors could not, as a matter of law, justifiably rely on an alleged verbal “commitment” to exercise the purchase option in the future because they had expressly agreed not to do so. Written exercise provisions avoid misunderstandings and swearing contests. In the case of business organizations, such notices identify the position and name of the individual purporting to exercise the option on behalf of the optionee. A signed written notice from such an entity provides greater assurance that the signator has assured herself or himself that the action has been duly authorized within the entity’s governance system.
Promissory estoppel, the next legal basis relied upon by the appellants, is an' equitable doctrine for the enforcement of agreements, not a device to nullify an expressly-agreed, written contractual term. Advanced Mktg. Sys. Corp. v. ZK Yacht Sales, 830 So.2d 924, 928 (Fla. 4th DCA 2002); Univ. of Miami v. Intuitive Surgical, Inc., 166 Fed.Appx. 450, 454 (11th Cir.2006) (“Promissory estoppel is not available as a remedy when parties have a written contract addressing the relevant issue”). In this case, the alleged telephonic notice of exercise of Duke Realty’s option is directly contrary to the written provisions of the contracts.
But the trial court’s correct application of the plain language of the parties’ agreements is not the only basis for finding the counterclaims legally insufficient. *903 Section 687.0304, Florida Statutes (2007), requires that a borrower may not take legal action on “an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation” unless “the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.” Coral Reef alleges in substance that Duke Realty agreed to forbear repayment,[5] and to make financial accommodations to Coral Reef, in a phone call. Coral Reef conceded throughout that it had no written agreement expressing consideration, setting forth the terms allegedly modified, and signed by the parties. Coral Reefs claim is thus also legally insufficient under what has been called “Florida’s Banking Statute of Frauds,” section 687.0304. Univ. Creek Assocs., II, Ltd. v. Boston Am. Fin. Group, Inc., 100 F.Supp.2d 1345 (S.D.Fla.2000).
Nor could the telephone call or Duke Realty’s conduct overcome the express written agreement (section 9.18 of the mortgage) between the parties that their relationship was not a joint venture. Having an enforceable legal right to become a joint venturer (upon the delivery of a specified written notice) is not the same as being one through implication. And becoming a joint venturer through implication was expressly disavowed in writing by the parties from the inception of their agreements.[6]
Finally, we address the counterclaim for tortious interference. As a lender that advanced $10,000,000 and invested significant managerial time in the investment, Duke Realty had every right to attend zoning hearings, review plans, consider cost estimates, and meet prospective lessees. Taking all such allegations as true, they do not establish a legally sufficient cause of action for tortious interference. See Ferris v. S. Fla. Stadium Corp., 926 So.2d 399, 401 (Fla. 3d DCA 2006).

Conclusion

The world of commercial real estate is not a warm and fuzzy place. That is why parties to substantial transactions consult counsel and prepare highly-detailed written agreements to address every contingency the parties and their counsel can imagine. “Get it in writing” is the watchword, for better or worse. In this case, the borrowers admitted default in writing and hoped for mercy. Having signed over 100 pages of single-spaced legal documents reviewed by their attorneys, Coral Reefs principals could not ignore the requirements of those documents and section 687.0304. Any assumption that a telephone call could commit Duke Realty to close a $12,000,000 purchase (following Coral Reefs conceded payment default) fails, as the trial court correctly determined based on the record here, as a matter of law.
Affirmed.
SCHWARTZ, Senior Judge, concurs.

. The judgments were also entered against the individual appellants, Douglas Landsea and Robert Shelley, as guarantors.

. These written statements are equivocal expressions of a then-current belief, not confirmation of an actual exercise of an option or a statement that Duke Realty would exercise the purchase option seven months later. Nonetheless, for purposes of review we assume that Landsea's account of his telephone conversation with Dunbar is true.

. Our Supreme Court or legislature may some day recede from this outdated common law concept. In the Uniform Commercial Code governing sales, in Florida as in all other states, a written agreement that says it can only be modified in a signed writing can only be modified in a signed writing. See § 672.209, Fla. Slat. (2009). The rule has *902 been extended to other contracts as well by statute in a number of states. The United States Court of Appeals for the District of Columbia Circuit has succinctly explained why the UCC rule is the better one:
The drawback of the common law rule is that it denies to all contracting parties, no matter how sophisticated, the ability to decide for themselves whether to restrict the manner in which their agreement may be modified. The UCC rule, on the other hand, enables those parties who mutually value certainty in their relations to have it; under the UCC rule, moreover, no one has to agree to rule out oral modifications nor, having so agreed, are the parties precluded from executing a mutually agreeable modification.
Martinsville Nylon Employees Council Corp. v. NLRB, 969 F.2d 1263, 1267 (D.C.Cir.1992).

. The option provision expressly stated that the option was irrevocable during its term. A hypothetical transaction to refinance the Duke Realty loan and mortgage, or to sell the property, during that term would not terminate the option or assure greater profit for Coral Reef.

. The appellants testified that the significance of the alleged "firm commitment” to exercise the purchase option was that the defaulted interest would be credited, and thereby forgiven, at the closing. The "firm commitment" is thus both an alleged agreement to forbear repayment of the interest and a "financial accommodation” in the form of an agreement to pay off the loan for Coral Reef despite the existence of the default.

. The legally-insufficient claims that a joint venture was formed will not support Coral Reef’s counterclaim for breach of a resulting fiduciary duty. As a creditor and debtor with no special relationship of trust and confidence to the other, neither Duke Realty nor Coral Reef assumed a fiduciary duty to the other. Watkins v. NCNB Nat'l Bank of Fla., Inc., 622 So.2d 1063, 1065 (Fla. 3d DCA 1993).