# Third District Court of Appeal

## State of Florida

Opinion filed June 13, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D17-1498 & 3D17-621
Lower Tribunal Nos. 12-38485 & 12-41460

_____


**Richard J. Diaz, et al.,**
Appellants,

vs.

**David Kosch, et al.,**
Appellees.


Appeals from the Circuit Court for Miami-Dade County, Eric William Hendon, Judge.

Eaton & Wolk, PL, and Douglas F. Eaton; Steven Kellough; Ramón A. Abadin, for appellants.

Duane Morris, LLP, and Scott D. Kravetz; Kluger Kaplan, and Alan J. Kluger; Russomanno & Borrello, and Herman J. Russomanno, III, for appellees.


Before ROTHENBERG, C.J., and SALTER and SCALES, JJ.

SALTER, J.

Richard Diaz and Ana Santisteban-Diaz ("Buyers") appeal a final summary judgment regarding claims and counterclaims in a failed residential real estate transaction (Case No. 3D17-621 here), and a final judgment against them for $850,000.00 for attorney's fees and costs incurred in the litigation by the appellees, David and Tiffany Kosch ("Sellers") (Case No. 3D17-1498). The cases were consolidated for oral argument and decision. We affirm the final judgments in each case.

The cases turn on strict, but enforceable, provisions in a contract governing a residential real estate transaction. The application of particular terms specifying the parties' paths toward closing or termination, and controlling the legal status of claims for damages in the aftermath of termination, presented proper issues for final summary judgment.

I.      Facts and Procedural History

A.      Disclosure Agreement and "As Is" Purchase Contract

The Sellers owned a home in Coral Gables. In March 2012, they listed the home for sale through Esslinger-Wooten-Maxwell, Inc. ("EWM"), an area real estate broker and sales company. As they did so, the Sellers also completed EWM's printed form of "Owner's Property Disclosure Statement," signed by them March 21, 2012 (the "March 2012 Disclosure Statement"). That form prominently discloses that the information provided is "to the best of the Owner's knowledge,"

2

that "it is not a warranty of any kind by the Owner," and that "it is not a substitute for any inspections or warranties the parties may wish to obtain."

The March 2012 Disclosure Statement included handwritten entries describing damage to a wall, the existence of a homeowners' association for an included backyard lot, and responses regarding a total of 16 different topics. Pertinent here, the Sellers marked "No" to any awareness of improvements constructed in violation of applicable building codes, without necessary permits, or with any open permits on the property not closed with a final inspection. They also marked "No" to any awareness of any toxic substances in the residence, including "accumulated radon." On the fourth page of disclosures, and above signature lines indicated for any prospective buyer or tenant receiving a copy of the completed form, bold-print terms include:

> **INSTRUCTIONS TO THE BUYER/TENANT:** Buyer/Tenant is encouraged to thoroughly inspect the property personally and/or have it inspected by a third party, and to inquire about any specific areas of concern. NOTE: If Owner answers "NO" to any of the pervious [sic] questions listed above, Owner does not necessarily mean that the matter in question does not exist on the property. "NO" may mean that the Owner is unaware that the matter in question exists on the property.

> **RECEIPT AND ACKNOWLEDGEMENT OF BUYER/TENANT** Owner is using this form to disclose Owner's knowledge of the condition of the property and improvements located on the property as of the date signed by Owner. This disclosure form is not a warranty of any kind. The information contained in the disclosure is limited to information which the Owner has knowledge. It is not intended to be a substitute for any inspection or professional advice the

3

Buyer/Tenant may wish to obtain. An independent professional inspection is encouraged and may be helpful to verify the condition of the property and to determine the costs of repairs, if any.

During the spring of 2012, the Buyers learned that the home was for sale and walked through it with the broker. Both of the Buyers were attorneys with substantial experience with real estate transactions and title matters. After various negotiations, the Buyers and Sellers entered into a printed form "'As Is' Residential Contract for Sale and Purchase" (the "Contract"),[1] effective September 2, 2012, for a purchase price of $2,850,000.00.

The Buyers made a $50,000.00 deposit with the Buyer's broker serving as escrow agent. A further deposit of $235,000.00 was payable to the escrow agent by September 12, 2012, the date at which a ten-day right of inspection and right to cancel was to expire absent Buyer termination.

The Contract included a handful of terms that governed the subsequent actions of the Buyers and Sellers. First, time was specified to be "of the essence." Second, the Contract included an integration and modification provision:

> **INTEGRATION; MODIFICATION:** This Contract contains the full and complete understanding and agreement of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended to be bound by it.

---

[1] The Contract form carried a legend indicating approval by The Florida Realtors and The Florida Bar.

4

Third, regarding disclosures, the Contract provisions included these terms:

**RADON GAS:** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

**PERMITS DISCLOSURE:** Except as may have been disclosed by Seller to Buyer in a written disclosure, Seller does not know of any improvements made to the Property which were made without required permits or made pursuant to permits which have not been properly closed.

. . .

**SELLER DISCLOSURE:** Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and have not been disclosed to Buyer. Except as stated in the preceding sentence or otherwise disclosed in writing; (1) Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation; and (2) Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property.

Fourth, and of particular importance here, the pertinent provisions regarding inspections of the property and the Buyers' right to cancel the transaction and terminate the Contract, in Paragraph 12, were:

(a) **PROPERTY INSPECTIONS AND RIGHT TO CANCEL**: Buyer shall have [10] days from Effective Date ("Inspection Period") within which to have such Inspections of the Property performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole discretion, that the Property is

5

not acceptable to Buyer, Buyer may terminate this Contract by delivering written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely terminates this Contract, the Deposit paid shall be immediately returned to Buyer, thereupon, Buyer and Seller shall be released of all further obligations under this Contract . . . Unless Buyer exercises the right to terminate granted herein, Buyer accepts the physical condition of the Property and any violation of governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all repairs and improvements required by Buyer's lender.

(b) **WALK-THROUGH INSPECTION/RE-INSPECTION**: On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

(c) **SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS**: If Buyer's Inspection of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed Permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations, consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to expend, any money.

(d) **ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES**: At Buyer's option and

6

cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties to Buyer.

      B.     The Inspection Period

During the ten-day inspection period, the Buyers learned that there were open building permits and that unpermitted work might have been performed as part of the Sellers' extensive renovations in 2009 and 2010.[2]  The Buyers did not obtain independent legal advice at that point, but instead relied upon their own real estate and litigation experience.

The day before the inspection period was to expire, the Buyers notified their broker by email that they had reviewed the permit history for the home and were very concerned that their visual inspection of the property "does not coincide with the permit history."  They advised that they were obtaining copies of the plans filed in the City and were conferring with a builder and an architect.  They also reported that they might need to come back to the property with a City inspector. This communication neither requested an extension of the inspection period nor served as a termination of the Contract.

---

[2]  The summary judgment evidence established that the renovations included work for which no permits were required (flooring, painting, interior doors and mirrors, and home theater equipment), work for which a permit was required and obtained, and other work performed by licensed contractors but with a permit unexpired as of September 2012.  In the course of the lawsuit, extensive discovery by the Buyers into the City of Miami and Sellers' records did not produce open notices of violation or citations for unpermitted work.

The following day, the Buyers emailed these concerns to the Sellers and their broker. In the late afternoon of the last day of the inspection period, September 12, 2012, the Buyers emailed to the Sellers a signed message with a legend, "This communication is sent for settlement purposes only," accusing the Sellers of affirmative misrepresentations "actionable under Florida law" and claiming that the property "has a significant diminished value than what we offered to pay for it." The email also contended (presciently, as it turned out) that "Legal fees in litigation with the facts presented here could easily be in the hundreds of thousands of dollars and of course during litigation, the property will not be marketable."[3]

The email also accused the Sellers of a total lack of good faith and asserted that "we also have independent tort remedies against you for the fraudulent concealment in not disclosing to us everything you know, and did, regarding the condition of the property which could lead to several years of litigation including a claim for punitive damages and of course a lis pendens on the property as well." The email closed with the statement that "If we do not receive written assurances from you by 5:30 pm today, rest assured this matter will go to full scale litigation."

---

[3] The Buyers were aware that the Sellers had already moved out of the home for their new home and work in Houston, Texas. The marketability point and threatened lis pendens clearly suggested years of carrying the burdens of two homes for the Sellers.

So instead of simply invoking paragraph 12(a), giving written notice of their absolute right to cancel the Contract for any reason and receive their $50,000.00 deposited to that point, the Buyers made their legal threats, argued for a significant price reduction, and notified the Sellers that they were invoking paragraph 12(c), to require the Sellers to promptly deliver "all plans, written documentation, or other information" relating to open permits and to cooperate with Buyer's efforts—at Buyer's expense—to conduct inspections and have estimates of such repairs or work prepared. The email asserted that Paragraph 12(c) "invariably requires that you agree to extend the inspection/due diligence period by a reasonable period of time" for the Sellers to comply with the Buyers' demands.[4]

And less than an hour later, at 5:30 p.m. on the last day of the inspection period, the Buyers emailed a second communication:

> This email will confirm that we are tendering the second deposit under the contract in good faith and as a display our [sic] ability to perform our end of the bargain under the contract. The tender of the additional deposit is made with full rights reserved, including but not limited to the terms detailed in the various emails sent by [the Buyers].

> Please be governed accordingly.

### C.    Notice of Cancellation; Offers to Return the Escrowed Deposit

---

[4]   Paragraph 12 in its entirety, and paragraph 12(c) in particular, contain no provision for an extension of the ten-day inspection period and right to cancel, and the "time is of the essence" provision of the Contract remained effective.

At this point, the Sellers and Buyers consulted independent real estate transactional lawyers to advise them. The Sellers retained a permit consultant to review the permitting and meet with the Buyers to discuss the costs and process for addressing their concerns, and the parties' transactional attorneys discussed earlier radon inspection reports with elevated readings in an upstairs bedroom. As part of those discussions, which lasted some 12 days after the expiration of the inspection/cancellation period (but with no written or unwritten extension of that period), the Buyers were also invited to schedule their own radon test. The Buyers did not do so.

On September 24, 2012, with no resolution of the parties' disagreements, and before any financing commitment was due to be provided by the Buyers to the Sellers,[5] counsel for the Buyers notified the Sellers' attorney by emailed letter that the Buyers were terminating the Contract, and instructed the escrow agent to return the entire $285,000.00 to the Buyers. The notice of termination does not claim a breach by the Sellers, nor does it report an inability by the Buyers to close the transaction based on their ability to procure a financing commitment.

Two days after the Buyers' attorney delivered the notice of termination of the Contract, that attorney emailed a letter to the Sellers' attorney reporting his understanding "that the Sellers will not consent to release of the earnest money

[5] The Contract specified that the Buyer's written loan commitment was to be obtained, and the Sellers notified, on or before September 27, 2012.

10

deposit by [the escrow agent] to the Buyers unless mutual releases are exchanged." The letter further states that the Contract "is 'as is' in nature and possesses a unilateral, unconditional cancellation right in favor of the Buyers. In no way does the contract require the exchange of releases as a pre-condition to return of the earnest money deposit."

Later that same day, the Sellers' attorney responded: "I imposed no conditions to the release of the earnest money deposit by the escrow agent. Pursuant to the contract, the escrow agent is free to act in accordance with its terms without the consent of either party and neither party may unilaterally impose any conditions to the release of the deposit by the escrow agent."

On October 2, 2012, one of the Buyers (litigation attorney Richard Diaz) emailed a letter to the Sellers' broker advising that (1) the Buyers believed "a significant amount of unpermitted work was done to the property which clearly has a material affect [sic] to its value;" (2) "there is a presence of mold and radon gas in the home that requires significant remediation;" (3) "an 'as is' contract will not save a seller (and potentially its listing agent) against a claim for fraud and/or fraudulent concealment," and (4) it was the broker's obligation, as well as the Sellers' "to inform any prospective buyer of everything you know," including "[sharing] the contents of this letter and its attachments with any and all prospective buyers.

11

On October 4, 2012, an emailed exchange between attorneys for the Sellers and the Buyers unequivocally established that the Sellers had not made a claim to the deposit at that point and would not object to the release of the deposit to the Buyers. Nonetheless, and apparently due to demands for a release by the Buyers' own broker (who served as the escrow agent), the deposit was not returned by the escrow agent.

### D. The Lawsuit

On October 18, 2012, the Buyers commenced their circuit court lawsuit against the Sellers and their brokers. The transactional attorney for the Sellers responded that the lawsuit "is a real game changer" making it "likely there will be a claim filed on behalf of the seller for forfeiture of the deposit as well as other possibly other [sic] claims and defenses in the pending lawsuit." Ultimately, a fourth amended complaint filed by the Buyers in April 2015 asserted claims for breach of contract, conversion, fraud in inducement, fraud in concealment, negligent misrepresentation, and conspiratorial fraud, with a claim for punitive damages asserted as well. The Sellers counterclaimed for the Buyers' breach and for the deposit as damages for the Buyer's default. Extensive and highly contentious discovery was undertaken, but by 2016 the Sellers and other defendants moved for summary judgment.

The trial court granted summary judgment for the brokers and then for the Sellers (as to the Buyers' claims and the Sellers' counterclaim for the still-escrowed deposit), with a final summary judgment entered in March 2017. The Sellers' motions for attorney's fees and costs were heard (the Sellers were awarded $850,000.00) and reduced to an amended final judgment in June 2017. These consolidated appeals followed.

II.    Standard of Review

We review summary judgments de novo. We consider the evidence in the light most favorable to the nonmoving party and must draw all competing inferences in favor of the nonmoving party. Piedra v. City of North Bay Village, 193 So. 3d 48, 51 (Fla. 3d DCA 2016). Matters of contract interpretation are also reviewed de novo, construing the terms according to their plain language. Dirico v. Redland Estates, Inc., 154 So. 3d 355, 357 (Fla. 3d DCA 2014).

Regarding the Buyers' appeal from the award of prevailing party attorney's fees to the Buyers, "The standard of review for an award of prevailing party attorney fees is abuse of discretion." Shands Teaching Hosp. v. Mercury Ins. Co., 97 So. 3d 204, 213 (Fla. 2012); Jaffe v. Jaffe, 147 So. 3d 578, 581 (Fla. 3d DCA 2014). The factors to be considered and included in findings of fact by the trial court regarding a fee award are set forth in Florida Patient's Comp. Fund v. Rowe, 472 So. 2d 1145 (Fla. 1985).

13

III.    Analysis

        A.    Buyers' Claims

The Buyers raise four arguments; each is alleged to present one or more genuine issues of material fact, such that the final summary judgment against the Buyers must be reversed:

(1) the Buyers' payment of the second deposit (despite their failure to terminate the Contract during the Inspection Period pursuant to Paragraph 12(a) above) did not constitute a waiver of their right to terminate the Contract without penalty (as opposed to pursuing a claim for breach and money damages);

(2)  the Sellers' alleged non-disclosure of radon issues was not waived by the Buyers;

(3)  following the Buyers' written termination of the Contract on September 24, 2012 (before the then-applicable closing date of October 2, 2012, and before the then-applicable deadline for securing a written loan commitment under Paragraph 8(b) of the Contract, September 27, 2012), the Sellers' conduct constituted a waiver of their right to receive the escrowed deposit; and

(4)  Buyers were entitled to summary judgment on their own breach of contract claim against the Sellers and their claim for the return of the escrowed deposit.

We agree with the trial court's determination that each of these issues was addressed in, and controlled by, the plain language of the Contract. We treat the Buyers' arguments (1) through (3) above in this section, III.A, and address the Sellers' entitlement to the deposit, argument (4), in section III.B. of this opinion.

The Buyers also allege error by the trial court in denying the Buyers' motion to amend the fourth amended complaint to add a claim for punitive damages. We affirm on this point without additional discussion, based on our disposition of the other issues raised by the Buyers.

### 1. Right to Terminate Without Penalty

Paragraph 12(a) of the Contract is unambiguous. By the end of the Inspection Period, there were two choices available to the Buyers: to issue a timely written notice of cancellation prior to the expiration of the Inspection Period, whereupon "the Deposit paid shall be immediately returned to the Buyer;" or to allow the Inspection Period to expire without issuing such a timely written notice, whereupon the Buyers were deemed to accept the "as is" condition of the Property. In the event of that second of the two choices, the Buyers were required to make the second payment of $235,000.00 to the escrowed deposit, as specified in Paragraph 2(b) of the Contract.

That provision does not include what the Buyers attempted to create: a "conditional tender" of that second deposit while ostensibly preserving both (a) the

Buyers' purported right to compel the Sellers to perform and pay for repairs, permitting issues, or other circumstances (i.e., to ignore the "as is" nature of the sale), and (b) the Buyers' purported right "to stay in the deal and close."[6]

Paragraphs 12(b) and 12(c) of the Contract establish a path to closing the transaction. Paragraph 12(b) addresses the walk-through inspection to be conducted "on the day prior to Closing Date," and Paragraph 12(c) addresses the Sellers' duty to provide documents and information between the end of the inspection/cancellation period and closing for the "close-out of building permits." The Buyers argue that this sequence of events should be altered, with Paragraph 12(c) made applicable even before the cancellation period has ended. The plain language of the provision and the "as-is" language of the Contract contradict such a reading.

Nothing in Paragraph 12(c) states that the Buyers' right to cancel the Contract pursuant to Paragraph 12(a) becomes subject to an open-ended extension if the public records reveal an open or needed permit. Such a reading ignores the "time is of the essence provision" in the Contract. See Garcia v. Alfonso, 490 So. 2d 130 (Fla. 3d DCA 1986). Any such extension, had one been agreed upon by the parties, would have been negotiated by the parties and reduced to a signed writing

---

[6] "Conditional tender" and "our ultimate election to stay in the deal and close" were the terms used by Buyer Richard J. Diaz to describe his written transmittal of the second deposit on September 12, 2012, in paragraph 14 of his affidavit filed in opposition to the Sellers' motion for summary judgment in 2016.

16

as required by Paragraph 18.P., the integration/modification provision within the Contract.

Instead, Paragraph 12(c) imposes a duty to assist the Buyers in the Buyers' resolution of any open or needed permits—but without any agreement by the Sellers to pay any expenses or extend the time for closing—<u>after</u> the inspection period expired without cancellation, and <u>after</u> the posting of the second deposit. Moreover, the Buyers admitted that the Sellers gave them access to the Residence and to their permitting consultant[7] in order to evaluate the cost to remedy any perceived shortcomings.

The Buyers' attorney's affidavit stated that, on September 19, 2012 (a week after the expiration of the inspection/cancellation period, and two weeks before the scheduled closing), the Buyers' attorney spoke to the Sellers' attorney and said that the Buyers were not satisfied with the possible cost involved in correcting unpermitted work. The Buyers' pleadings submitted with the affidavit stated that the Buyers cancelled the Contract because the Sellers would not give them credits at closing equal to the amount the Buyers contemplated any remedial work would cost.

---

[7] It is undisputed that the Sellers paid the permitting consultant over $32,000.00 to meet with the Sellers' contractor, to assess any open or required permits, and to meet with the Buyers to go over that information.

Finally, in their written notice of September 24, 2012, terminating the Contract, the Buyers did not allege a default by the Sellers under Paragraph 15(b) of the Contract. By including a demand in the notice of termination for the escrow agent "to return the entirety of the earnest money deposit to the Buyer," the Buyers were memorializing their claim that the inspection/cancellation period had been extended, but without a signed writing or on the basis of additional consideration by the Buyers. Coral Reef Land Dev., LLC v. Duke Realty Ltd. P'ship, 45 So. 3d 897, 901-02 (Fla. 3d DCA 2010) (oral modifications permitted, despite written contract requiring modifications to be in writing, "when one party provides additional consideration for the modification accepted by the other party.").

The Buyers did not obtain a written agreement extending the cancellation period, nor did they furnish additional consideration beyond that required by the existing agreement. Based on the Buyers' threats of litigation and lis pendens before the end of the cancellation period, the Sellers correctly characterized any discussions regarding a contract extension or purchase price adjustment as "settlement negotiations," rather than definitive terms.[8] No proposed written modification acceptable to the Buyers was ever even tendered to the Sellers or their counsel.

2.   Radon

---

[8] Janice Russell Aff. ¶10, Aug. 1, 2013.

18

The Buyers' arguments regarding radon disclosure and "waiver by conduct" also fail because of the controlling provisions of the Contract and the undisputed facts relating to the Buyers' knowledge and written communications. Regarding radon, it is first appropriate to observe that all residential buyers in 2012 were required to be placed on notice by statute (as they are now and have been for some 30 years), that:

> RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

§ 404.056(5), Fla. Stat. (2012). As already noted, the Contract included the statutory disclosure. Although the Buyers attempt to parlay an elevated radon level in one test into a claim of fraud, the summary judgment evidence discloses that: both Buyers were experienced real estate attorneys familiar with radon tests; the Buyers' own expert witness on the topic testified that home buyers in Florida should do a radon test during their due diligence period; radon levels fluctuate naturally;[9] radon tests are never exact; and "you could test in a certain room one week and then come back two weeks later and get a different result."

---

[9] As the radon disclosure statute indicates, radon is a naturally occurring gas that can accumulate in buildings. The short-term measurements obtained by ARS Environmental, Inc., a month before the Contract was signed—and provided to a non-party previously interested in buying the home—disclosed that "Fluctuations in radon levels occur naturally. Many factors, including the weather, can affect the

The Buyers did not obtain a radon test during the due diligence period. The Sellers' attorney obtained information regarding an elevated radon reading and disclosed it to the Buyers' attorney, noting in an email, "please let [Sellers' broker] know if your clients wants [sic] to schedule a radon test." The Buyers did not schedule such a test before terminating the Contract. In granting summary judgment on the issue in February 2017, the trial court stated, "there was information provided to the [Buyers] that radon did exist and he was on notice if he wanted to go ahead and test for it. He chose not to."

Just as the Buyers were aware that the accessible public records showed open permits and that the Sellers' contractor might not have obtained a permit for some part of the renovations three years earlier, the Buyers were aware that radon can be easily and inexpensively tested during the inspection period. The Buyers rely on Johnson v. Davis, 480 So. 2d 625, 629 (Fla. 1985), for the duty to disclose "facts materially affecting the value of the property which are not readily observable and are not known to the buyer." But in this case, the Contract terms disclaimed any such rights by apprising the Buyers that they could and should conduct their own inspections, and the Buyers never established that the permitting and radon matters were not observable, were actually known to the Sellers at the

readings."

20

time of entering into the Contract (as opposed to the Sellers' contractor or broker), and materially affected the value of the Property.

Though aware of the permitting questions, the Buyers did not cancel the Contract at the close of the inspection period, nor did they prepare and furnish a written request for an extension of the inspection period. Though aware that radon is an issue in all Florida residential contracts, the Buyers neither tested nor accepted the offer to test after learning that part of the home had an elevated radon level in a test taken months after the Sellers had moved to Houston. As this Court held in Pressman v. Wolf, 732 So. 2d 356, 362 (Fla. 3d DCA 1999), Johnson v. Davis does not extend to conditions that "were readily observable and/or within the buyer's ability to know or easily discover."[10]

### 3.     "Sellers' Waiver by Conduct"

The Buyers argue that, by providing access to their permitting consultant and discussing the costs of closing permits, the Sellers waived any right to claim the escrowed deposit. This argument fails because the discussions in question occurred after the Buyers' written accusations and claims of fraud on the part of

---

[10] The Buyers argue that the Florida Supreme Court "expressly disapproved" this Court's decision in Pressman, in M/I Schottenstein Homes, Inc. v. Azam, 813 So. 2d 91 (Fla. 2002). The Sellers have correctly countered, however, that the Supreme Court only disapproved a broad statement in Pressman that "Statements concerning public record cannot form the basis for a claim of actionable fraud." 813 So. 2d at 96. The decision did not address on-line municipal permit records.

21

the Sellers, reiterated here, in the Buyers' email on the last day to cancel without penalty:

> we also have independent tort remedies against you for the fraudulent concealment in not disclosing to us everything you knew, and did, regarding the condition of the property which could lead to several years of litigation including a claim for punitive damages and of course a lis pendens on the property as well.
>
> . . .
>
> If we do not receive written assurances from you by 5:30 pm today, rest assured this matter will go to full scale litigation.

This Court has repeatedly held that, following accusations of fraud, the accuser may not then "justifiably rely" on the representations of the accused in subsequent negotiations aimed at resolving the dispute. See Sugar v. Estate of Stern, 201 So. 3d 103, 108 (Fla. 3d DCA 2015); Moriber v. Dreiling, 194 So. 3d 369, 375 (Fla. 3d DCA 2016).

### B.   Sellers' Claim to the Deposit

Finally, the Buyers contend that the Sellers waived their right to claim a default by the Buyers and resultant entitlement to the escrowed deposit. This issue is squarely addressed by Paragraph 15(a) of the Contract, appearing under the heading "DEFAULT AND DISPUTE RESOLUTION:"

> 15. DEFAULT:
>     (a) BUYER DEFAULT: If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract, including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit for the account of Seller as agreed upon

liquidated damages, consideration for execution of this Contract, and in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's rights under this Contract.

Of these two options, and after being sued by the Buyers, the Sellers elected the first of the two options, retention of the deposit (as opposed to specific performance, the second option). The Sellers were excused from setting a closing location and demonstrating that they were ready, willing, and able to close, by virtue of the Buyers' anticipatory repudiation of any obligation to close issued in their letter of September 24, 2012. See Hosp. Mortg. Grp. v. First Prudential Dev. Corp., 411 So. 2d 181 (Fla. 1982).

### C.    Attorney's Fees

There is no question that the Sellers prevailed, the Buyers did not, and the Contract contained a fee-shifting provision. The amount of attorney's fees in the context of a failed residential real estate transaction may seem shocking, but a review of the 6,000 page record is sufficient to persuade the patient reader that this was no ordinary lawsuit relating to a buyer-seller dispute.

Early in the litigation—and this relates to mitigation of damages and fees—the Sellers offered to exchange releases, allow the Buyers to receive the $285,000.00 deposit, and pay the Buyers a further $40,000.00 simply to end the matter. The offer was not accepted.

23

The trial court conducted an evidentiary hearing, considered expert testimony, reviewed the hours and hourly rates claimed, and reduced the fees by over $90,000.00. The trial court heard, considered, and ruled upon the factors specified in Florida Patient's Compensation Fund v. Rowe, 472 So. 2d 1145 (Fla. 1985).

In light of the number of depositions taken by the Buyers; the number of non-party witnesses subpoenaed for testimony and records; the eleven sets of interrogatories and nine requests for production of records served on the Sellers; the dead-end allegations pertaining to improper record destruction and computer forensics; and hearings on a wide array of motions, including unsuccessful claims by the Buyers for punitive damages; we cannot and do not conclude that the trial court abused its discretion in awarding the attorney's fees to the Sellers or in determining the amount of that award.

IV.     Conclusion

The "as is" residential real estate contract developed jointly by the Florida Realtors and The Florida Bar reflects a middle-of-the-road form intended to reduce the legal fees that could be incurred if purchase contracts started from scratch for each transaction. The form reflects a wealth of experience with both successful and failed transactions among professional realtors and real estate attorneys.

The Buyers sought to transform an "as is" form of contract into a continuously-negotiable-price transaction by attempting their "conditional tender" of the second deposit payment and allowing the due diligence/cancellation period to expire without issuing a termination notice. The summary judgment evidence showed that they did this in order to avoid losing the Property to a backup buyer, while simultaneously attempting to preserve a claim to a reduction in the purchase price.

Once bound by the Contract after the expiration of the cancellation period, the Buyers further exacerbated their position by doing two things. First, they unilaterally terminated the Contract before the expiration of the financing contingency and before the closing date. Second, in an effort to enhance their leverage and obtain tort damages beyond a contractual remedy (return of the escrowed deposit, offered by the Sellers though under no obligation to do so following the Buyers' default), the Buyers launched a bitter and "no holds barred" lawsuit against the Sellers.[11]

---

[11] One of the Buyers, Richard Diaz, signed his own 57-page motion for leave to amend their fourth amended complaint to claim punitive damages in 2016; co-counsel then representing him did not sign it. The tone is illustrated by these excerpts: (1) "Before analyzing [Sellers'] *specific acts* of evilness, outrageousness, conscious and reckless disregard for [Buyers'] rights, we must first spotlight *what the evidence shows they knew and when*." (2) "There was *no* reason on God's green earth for [the brokers and Sellers] to have hidden what they knew from [Buyers] about the radon gas issue except to satisfy their greed for [Buyers'] money."

Finding no reversible error in the final judgments entered by the trial court, we affirm the judgments in all respects.